IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MICHAEL PICKENS,<br>　　　　Plaintiff, | § § § | |
| v. | § § | Civil Action No. 3:19-CV-1870-BH |
| ANDREW SAUL,<br>COMMISSIONER OF SOCIAL<br>SECURITY ADMINISTRATION,<br>　　　　Defendant. | § § § § § | Consent Case[1] |

## MEMORANDUM OPINION AND ORDER

Michael Pickens (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for supplemental security income (SSI) under Title XVI of the Social Security Act. (*See* docs. 1, 21.) Based on the relevant filings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED**.

## I. BACKGROUND

On May 24, 2016, Plaintiff filed his application for SSI, alleging disability beginning May 24, 2016. (doc. 13-1 at 52, 215.)[2] His claim was denied initially on November 15, 2016 (*Id.* at 99), and upon reconsideration on August 11, 2017 (*id.* at 119). On October 2, 2017, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (*Id.* at 156.) He appeared and testified at a hearing on July 20, 2018. (*Id.* at 50-75.) On September 27, 2018, the ALJ issued a decision finding him not disabled. (*Id.* at 22.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on November 26, 2018.

---

[1]By consent of the parties and the order of transfer dated October 18, 2019 (doc. 17), this case has been transferred for the conduct of all further proceedings and the entry of judgment.

[2]Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

(*Id.* at 213.)  The Appeals Council denied his request for review on June 6, 2019, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 7.)  He timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

A. **Age, Education, and Work Experience**

Plaintiff was born on July 28, 1973, and was 44 years old at the time of the hearing. (doc. 13-1 at 52, 215.)  He had a GED and could communicate in English. (*Id.* at 56.)  He had no past relevant work. (*Id.* at 71.)

B. **Medical, Psychological, and Psychiatric Evidence**[3]

On April 1, 2016, Plaintiff presented to Metrocare Services (Metrocare) for mental evaluation and treatment. (*Id.* at 1075.)  He reported sadness his entire life, as well as depression, anger, low energy, decreased motivation, anhedonia, and desire to isolate. (*Id.* at 1077.)  He had received psychological treatment "off and on" since 2001, and was recently homeless after living with his significant other for approximately two years. (*Id.* at 1076.)  He was paranoid and delusional and would get into manic stages at times; he had previously taken Wellbutrin, risperidone, and Benzotoprine while in prison and felt they helped level him. (*Id.* at 1076-77.)  During mental examination, he was alert, oriented times four, and cooperative, with normal speech and psychomotor skilss. (*Id.* at 1076.)  He reported psychosis, paranoid delusions, and depressed mood, and he had organized thought process and intact memory, but impaired attention, with fair insight, judgment, and impulse control. (*Id.*)

On April 5, 2016, Plaintiff presented to Parkland Hospital (Parkland) complaining of

---

[3]Because only Plaintiff's psychological and psychiatric impairments are relevant to the issue under consideration, physical medical evidence is noted only when it includes information relevant to the mental impairments.

depression. (*Id.* at 800-05.) He reported that things were not going very well for him at the shelter due to interactions with other residents, but that he had restarted medication after three years of no medication for his bipolar and schizophrenia. (*Id.* at 800, 803.) On mental examination, his behavior was normal, his speech was rapid and pressured, his thought content was paranoid, and his cognition and memory were normal. (*Id.* at 804.) He expressed impulsivity, inappropriate judgement, and depressed mood, but he had good eye contact, was oriented times four, was problem-focused, had fair insight, and denied intent to harm self. (*Id.*) He was assessed with a severe episode of recurrent major depressive disorder without psychotic features. (*Id.* at 805.)

On April 29, 2016, Plaintiff presented to Metrocare for a mental health engagement session. (*Id.* at 1087.) On examination, his grooming and hygiene were within normal limits, he was alert and oriented times four, and he denied suicidal/homicidal ideation or drug/alcohol use since his last appointment. (*Id.*) He reported minimal depression and anxiety, and that his medications were effective at treating his symptoms. (*Id.*) He would sleep 4 to 6 hours a night and had problems being in big crowds, but he was pleased with his current medications and able to function daily. (*Id.*)

On May 20, 2016, Plaintiff returned to Metrocare for medication refills. (*Id.* at 1091.) He reported that the current combination of medications was "somewhat beneficial," but he continued to struggle with mood fluctuation, irritability, dysphoria, difficulty concentrating, and paranoid ideations. (*Id.*) He denied active auditory and visual hallucinations, panic attacks, anhedonia, substance abuse, or suicidal/homicidal ideation. (*Id.*) On mental examination, he was adequately groomed, was cooperative, had normal speech and psychomotor skills, was paranoid, and showed signs of psychotic features. (*Id.* at 1090.) He had organized thought, restricted affect, irritable mood, and normal attention; was alert, oriented times 4, and anxious; and had fair judgment, insight, and

3

impulse control. (*Id.* at 1090-91.)  His diagnosis was updated to bipolar 2 disorder and cannabis-use disorder, and his medications were adjusted. (*Id.* at 1091.)

On August 3, 2016, Plaintiff presented to Parkland for back pain evaluation. (*Id.* at 796-97.) He self-reported schizophrenia and bipolar disorder, but responded to questions appropriately, and his mental examination was unremarkable. (*Id.*)

On August 11, 2016, Plaintiff presented to Medical City Hospital (Medical City) with hallucinations and panic attacks. (*Id.* at 884.)  He reported that someone was in his house, but there was no one else there. (*Id.*)  He did not have anxiety and denied suicidal/homicidal ideation or recent drug use. (*Id.*) On mental examination, he was alert, well-appearing, anxious, hyperventilating, and oriented times three, with normal speech, no motor deficits, and no sensory deficits. (*Id.* at 886.) He was assessed with hallucinations, drug abuse, panic attacks, and psychosis, and his condition was stable on discharge. (*Id.* at 887.)  His laboratory results were presumptively positive for marijuana, Amphetamines, and Methamphetamines. (*Id.* at 889.)

On August 13, 2016, Plaintiff was transported by ambulance to Green Oaks Hospital (Green Oaks) after his wife called 9-1-1 because he was hearing people calling his name and was paranoid that someone was out to get him. (*Id.* at 927.)  He reported being sober for a year, but believed his neighbor had drugged him by spiking his drink. (*Id.*)  He denied suicidal/homicidal ideation or feeling anxious or depressed, but had only been sleeping 1 to 2 hours for the past few months. (*Id.*) He was future-focused and did not show any signs of psychosis. (*Id.* at 928.)  He had fair appearance, was cooperative, had normal speech and volume, had euthymic mood and normal affect, and was oriented times three, with intact memory, well-organized train of thought, normal attention span, and no hallucinations or delusions. (*Id.*)  He was diagnosed with other stimulant

4

use/unspecified psychosis; prescribed Wellbutrin, Haoldol Risperdal, Trazodone, Ativan, Vistaril, Benadryl, Cogentin, Clonidine, and Neurontin; and discharged the following day. (*Id.* at 933-34.)

On September 1, 2016, Plaintiff returned to Metrocare for a follow-up visit and medication adjustment. (*Id.* at 941-43.) He reported being hospitalized for 2 to 3 days after hallucinating badly, and that he continued having less intense hallucinations. (*Id.* at 942.) He continued to struggle with obtaining work, finding a living place, and other psychosocial barriers after his incarceration. (*Id.*) He was calm and cooperative, and his mental status examination was generally unchanged from his May 2016 appointment. (*Id.*) He was continued on his current regimen and received refills for Risperdal, Seroquel, wellbutrin, and hydroxyzine. (*Id.*)

On September 7, 2016, Plaintiff was taken to Green Oaks by police because he was running in and out of traffic, trying to get away from people that did not exist. (*Id.* at 910.) He stated that he was a "paranoid schizophrenic" and thought someone was after him. (*Id.*) He admitted suicidal ideation with no current plan, as well as alcohol and daily marijuana use. (*Id.*) On mental examination, he showed poor appearance, was evasive and agitated, and had loud, rapid, and pressured speech. (*Id.*) He was noted as paranoid, anxious, dysphoric, having inappropriate affect, oriented times three, and having loose associations, as well as having auditory hallucinations and visual delusions, with intact memory, disorganized and tangential train of thought, and poor insight and judgement. (*Id.* at 910-11.) He was discharged the next day with brief psychotic disorder, other stimulant use/independent psychosis, mood disorder, and unspecified anxiety disorder. (*Id.* at 914.) His prognosis was fair with sobriety and treatment adherence. (*Id.*)

On October 31, 2016, Plaintiff presented to Metrocare for medication refills. (*Id.* at 1200.)

His Global Assessment of Functioning (GAF) was 45,[4] but he reported doing better after his medications were adjusted and wanted to refill his current medications. (*Id.* at 1200-01.) He denied suicidal/homicidal ideation, hallucinations, having other concerns, distress, panic attacks, anhedonia, or illicit substance use. (*Id.* at 1201.) His mental examination was generally unremarkable, except he showed psychosis and paranoid delusions, with fair judgment, insight, and impulse control. (*Id.* at 1202-03.)

On November 14, 2016, State Agency Psychological Consultant (SAPC) Caren Phelan, Ph.D., completed a Psychiatric Review Technique (PRT) for Plaintiff. (*Id.* at 82-96.) She found that his affective disorder was a severe medically determinable impairment, but that his alleged limitations were only partially supported by the medical evidence. (*Id.* at 84.) Dr. Phelan opined that he was moderately restricted in his activities of daily living, had marked difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, and had one or two episodes of decompensation. (*Id.* at 87-88) She found that Plaintiff did not have understanding and memory limitations, but he had sustained concentration and persistence limitations, and he was moderately limited in: carrying out detailed instructions; maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; working in coordination with or proximity to others without distracting them; and completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace without an unreasonable

---

[4]GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health. *See Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001). A GAF score between 41 and 50 is classified as "reflecting serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* at 702.

number and length of rest periods. (*Id.* at 94-95.) He had social interaction limitations and was moderately limited in interacting appropriately with the public, in accepting instructions and responding appropriately to criticism from supervisors, and in getting along with coworkers without distracting them or exhibiting behavioral extremes, and he had adaptation limitations and was moderately limited in responding appropriately to changes in the work setting. (*Id.* at 95.)

Dr. Phelan also completed a mental RFC assessment and found that Plaintiff could understand, remember, and carry out detailed but not complex instructions; make decisions; attend and concentrate for extended periods; interact appropriately with supervisors and coworkers; and respond appropriately to changes in routine work setting. (*Id.* at 95-96.) She noted that this mental RFC was applicable when Plaintiff was not abusing substances. (*Id.*)

On January 5, 2017, Metrocare contacted Plaintiff about his missed appointment and warned him about being removed from its caseload for missing another appointment. (*Id.* at 1238.)

On January 9, 2017, Plaintiff presented to Parkland for low back pain. (*Id.* at 1241.) On examination, he was negative for agitation and confusion, was oriented times three, and was not distressed, with normal mood, affect, and behavior. (*Id.* at 1243.)

On January 16, 2017, Plaintiff returned to Parkland with back pain and depression. (*Id.* at 1521-52.) He did not appear nervous or anxious, and he was negative for confusion, hallucinations, self-injury, and suicidal ideas. (*Id.* at 1253.) He reported being depressed, anxious, and irritable in the past two weeks and that his medications helped with his mood, but he last took his medications over a month ago and needed refills. (*Id.* at 1256.) He had persecutory delusions almost daily and his mood was more depressed than manic, but he denied auditory or visual hallucinations or any thoughts to harm self or others. (*Id.*) The examining nurse practitioner (NP) noted that Plaintiff

7

appeared overwhelmed and depressed due to unstable housing and financial instability that was worsened by medication non-compliance, and that he still exhibited paranoia but no hallucinations. (*Id.* at 1263.) The NP opined that his depressed mood with paranoid delusions for more than 6 months met the criteria for schizoaffective bipolar. (*Id.*) He received refills of his psychotropic medications and was discharged the following day. (*Id.*)

On January 29, 2017, Plaintiff was admitted to Parkland with suicidal ideation. (*Id.* at 1299.) He reported psychosis and cannabis use disorder, and that his suicidal thoughts were due to his homelessness. (*Id.*) He and his wife had been evicted a few weeks before, but he had nowhere to go since he was not allowed at most shelters due to his past aggressive behaviors. (*Id.*) He had also lost his ID card and other personal effects a day before, and he had been off of his medications for two months, although he did well when he took them. (*Id.*) His mental status examination results were within normal limits, other than his depressed mood and fair insight. (*Id.* at 1300-01.) His urine screen was negative except for marijuana, and his medications were restarted. (*Id.* at 1300-06.)

On June 13, 2017, Plaintiff presented to Parkland for medication refills for his back pain and depression. (*Id.* at 1312.) He reported living with a friend and being out of medication, but he did not have other concerns. (*Id.*) His mental examination was normal, and he denied feelings of depression or hopelessness on his patient health questionnaires. (*Id.* at 1315, 1325.)

On August 2, 2017, Carol Mohney, Ph.D., another SAPC, reviewed the medical evidence and completed a mental RFC that mirrored Dr. Phelan's mental RFC. (*Id.* at 135.) She also affirmed Dr. Phelan's assessment of Plaintiff's mental limitations and concluded that Plaintiff's alleged limitations were not fully supported by the medical evidence. (*Id.* at 133-35.) Dr. Mohney completed a PRT, opining that Plaintiff was mildly restricted in understanding, remembering, or

applying information and in concentrating, persisting, or maintaining pace, and was moderately restricted in interacting with others and in adapting or managing oneself. (*Id.* at 128.)

On January 26, 2018, Plaintiff was apprehended by a peace officer and taken to Parkland for a mental health evaluation. (*Id.* at 1338.) He reported that his wife had kicked him out after arguing for three days, and that he had homicidal ideas but no desire to actually hurt anyone. (*Id.*) He had been talking psychotropic medications "off and on for 5 years," but did not want to take them because they made him feel like a "different person." (*Id.*) He was scheduled to work at Dollar Tree, and planned on going there if discharged on time. (*Id.*) On examination, he reported feeling "uncomfortable with [him]self" his entire life, and stated that he was a fighter and had homicidal thoughts about "anyone who crosse[d] [him]." (*Id.* at 1334.) He had not been compliant with his psychotropic medications for four to five months, but he denied increased stress, worsening of psychological problems, or illicit drug use. (*Id.*) The examining NP noted that Plaintiff was "overall calm, but evasive, guarded, and manipulative," and that he was not psychotic or manic and remained highly organized and future oriented. (*Id.* at 1344-45.) The NP opined that he did not suffer from any psychiatric condition that rendered him incapable of differentiating right from wrong, and assessed him with cannabis and alcohol abuse, malingering, and antisocial personality disorder. (*Id.* at 1345.) Plaintiff declined medication refills; his condition was stable on discharge. (*Id.*)

On May 4, 2018, Plaintiff presented to Parkland with concerns of worsening homicidal ideation. (*Id.* at 1374.) He reported being angry about his life and feeling homicidal towards everyone around him. (*Id.*) While waiting, he attempted to attack officers and was placed in restraints and administered a sedative. (*Id.*) The attending physician noted a history of suspected antisocial personality disorder and bipolar disorder, with a 20-year history of anger problems and

9

unsuccessful course of medications due to side effects. (*Id.* at 1382.) Plaintiff requested therapy treatment, but would reconsider medication treatment through Metrocare. (*Id.*) The physician assessed unspecified bipolar disorder, with a guarded prognosis when off medications. (*Id.*)

**C.** **Hearing**

On July 20, 2018, Plaintiff, his wife, and a vocational expert (VE) testified at a hearing before the ALJ. (*Id.* at 52.) Plaintiff was represented by an attorney. (*Id.*)

### 1. *Plaintiff's Testimony*

Plaintiff testified that he lived with his disabled wife, and that she took care of the household bills. (*Id.* at 56.) He did not own a car and got to the hearing via public transportation. (*Id.*) He did not graduate high school, but had a GED. (*Id.*) He took ibuprofen, Gabapentin, and Methocarbamol before the hearing. (*Id.* at 58.) His medications made him lethargic and inhibited his ability to focus, but he was redoing his medications with a new therapist at Metrocare. (*Id.*) He had back problems and need to use a cane. (*Id.* at 59-61.) He had been bipolar and paranoid schizophrenic most of his life, but was not formally diagnosed until 2001. (*Id.* at 61.) His father kicked him out of the house when he was 12 years old, and he developed a "natural paranoia just from having to survive in everything [he] had to do." (*Id.* at 62.) His paranoia made him "scared of anybody and everybody" and would overwhelm him. (*Id.*) He had not held a job more than six months and had walked off jobs due to paranoia. (*Id.* at 62-64.)

### 2. *Wife's Testimony*

Plaintiff's wife testified that he had been hospitalized for pain and paranoia. (*Id.* at 67.) He had woken up in hysterics at night, and his paranoid schizophrenia prevented him from focusing. (*Id.*) He had walked off jobs because he felt someone was after him. (*Id.* at 68.) He could only do

10

light work around the house that did not hurt his back. (*Id.*)

### 3. *VE's Testimony*

The VE considered a hypothetical individual with no past work history and the same background and educational experience as Plaintiff, who was limited to sedentary work and could climb ramps and stairs occasionally, but never climb ropes, ladders or scaffolds; could occasionally balance, stoop, kneel, crouch, and crawl; needed to avoid exposure to extremes of heat and to hazards like unprotected heights and unguarded moving machinery; and could perform simple routine tasks and simple decision-making in an environment involving few, if any, workplace changes, with occasional interaction with supervisors, coworkers, and the public. (*Id.* at 71-72.) That person could perform work, including table worker (sedentary and SVP-2) with 125,000 jobs nationally; patcher (sedentary and SVP-2) with 65,000 jobs nationally; and bonder semiconductor (sedentary and SVP-2) with 168,000 jobs nationally. (*Id.*) He would not be able to perform any job in the national economy if he would need unscheduled work breaks during the day and be off task more than 15% of the workday or work week, or would be absent from work more than two days per month because of a combination of medical conditions, associated symptoms, and need for treatment. (*Id.* at 72.) The person could not perform the jobs identified by the VE if he could not interact with coworkers and the public, and would be automatically terminated for walking off the job without telling a supervisor. (*Id.* at 73-74.) The VE's testimony was consistent with the DOT, except that her answers on interactions with supervisors, coworkers, and the public and on off task time and absenteeism, were based on her 25 years of experience placing people in jobs and working with employers. (*Id.* at 72-73.)

### D. **ALJ's Findings**

The ALJ issued a decision denying benefits on September 27, 2018. (*Id.* at 25-34.) At step one, she found that Plaintiff had not engaged in substantial gainful activity since his onset date of May 24, 2016. (*Id.* at 27.) At step two, the ALJ found that he had the following severe impairments: lumbar spine status post two-level fusion and a bipolar disorder. (*Id.*) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the social security regulations. (*Id.* at 29.)

Next, the ALJ determined that Plaintiff retained the RFC to perform sedentary work as defined in 20 C.F.R. § 416.967(a), with the following limitations: stand/walk for two hours per day; sit for six hours per day; lift ten pounds occasionally and less than ten pounds frequently; occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; no exposure to extremes of heat or to hazards such as unprotected heights and unguarded moving machinery; perform simple, routine tasks and simple decision-making in an environment that involved few, if any, workplace changes; and occasionally interact with supervisors, coworkers, and the public. (*Id.* at 30.) At step four, the ALJ determined that Plaintiff did not have any past relevant work. (*Id.* at 33.) At step five, the ALJ found that considering his age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that he could perform. (*Id.*) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, at any time since May 24, 2016, the alleged onset date. (*Id.* at 34.)

## II.  STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the

Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last

13

for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A

14

finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III. NONCOMPLIANCE WITH TREATMENT

Plaintiff's sole issue for review is whether the ALJ properly considered his noncompliance with mental health treatment. (doc. 21 at 3.)

"An ALJ is entitled to consider noncompliance with prescribed medical treatment as a factor in the overall disability determination." *Luzenia K. v. Saul*, No. 3:19-CV-01006-BT, 2020 WL 2574933, at *6 (N.D. Tex. May 20, 2020) (citations omitted); *see also Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990) ("A claimant's non-compliance with treatment is a proper factor for the ALJ to consider in assessing credibility."). Failure to follow prescribed treatment is relevant in determining whether disability exists and is an indication of nondisability. *See* 20 C.F.R. § 416.930; SSR 82-59, 1982 WL 31384, at *1 (S.S.A. 1982) ("Individuals with a *disabling impairment* which is amenable to treatment that could be expected to restore their ability to work must follow the prescribed treatment to be found under a disability, unless there is a justifiable cause for the failure to follow such treatment.") (emphasis original).

Under SSR 82-59, "[a]n individual who would otherwise be found under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source which the Social Security Administration (SSA) determines can be expected to restore the individual's ability to work, cannot by virtue of such 'failure' be found to be under a disability." SSR 82-59, 1982 WL 31384, at *1.[5] Even though SSR 82-59 typically applies only after a finding that the claimant is

---

[5] Failure to follow prescribed treatment is an issue "only where all of the following conditions exist:"

1. The evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity (SGA) or, in the case of a disabled widow(er) that the impairment meets or equals

15

disabled at step 5, the ALJ must adhere to its procedures if she relies "almost exclusively" on noncompliance with prescribed treatment to determine the claimant's RFC, and in ultimately finding him not disabled. *See Lindsey v. Astrue*, No. 3:09-CV-1649-BF, 2011 WL 817173, at *8 (N.D. Tex. March 9, 2011) ("[T]he ALJ cannot circumvent the requirements of SSR 82-59 and §§ 404.1535 and 416.935 by couching her analysis of substance use and noncompliance in terms of an RFC determination."); *Simmons v. Berryhill*, No. 4:17-CV-684-A-BJ, 2018 WL 3900912, at *4 (N.D. Tex. July 31, 2018), *adopted by* 2018 WL 3873664 (N.D. Tex. Aug. 15, 2018) ("[I]f the ALJ's ultimate finding that a claimant was not disabled is based significantly on the ALJ's perception that the plaintiff's failure to follow a prescribed treatment caused the condition to be worse than it might otherwise be, then the requirements of SSR 82-59 apply."); *Busby v. Colvin*, No. CV H-15-2929, 2017 WL 818582, at *10-11 (S.D. Tex. Feb. 10, 2017), *adopted sub nom. by* 2017 WL 822123 (S.D. Tex. Feb. 28, 2017) ("If the ALJ bases the RFC or ultimate finding of disability on a claimant's noncompliance with treatment, whether explicitly or implicitly, then the ALJ must follow SSR 82-59."). If the ALJ considers the claimant's noncompliance "in connection with assessing the claimant's credibility and in making a determination as to the severity of the claimant's alleged subjective symptoms, SSR 82-59 need not be mentioned or followed." *Fall v. Astrue*, No. CIV.A. H-12-0265, 2012 WL 6026438, at *10 (S.D. Tex. Dec. 4, 2012); *see Busby*, 2017 WL 818582, at

---

the Listing of Impairments in Appendix 1 of Regulations No. 4, Subpart P; and

2. The impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death;

3. Treatment which is clearly expected to restore capacity to engage in any SGA (or gainful activity, as appropriate) has been prescribed by a treating source; and

4. The evidence of record discloses that there has been refusal to follow prescribed treatment.

SSR 82-59, 1982 WL 31384, at *1.

16

\*10-11 (finding SSR 82-59 inapplicable when "noncompliance with treatment was considered by the ALJ for the purposes of determining the plaintiff's credibility and severity of the plaintiff's symptoms"); *Johnson v. Comm'r of Soc. Sec. Admin.*, No. 3:11-CV-3126-L-BF, 2013 WL 632104, at \*21 (N.D. Tex. Feb. 4, 2013) (explaining that the ALJ was not required to follow the requirements of SSR 82-59 because the ALJ "merely utilized [p]laintiff's noncompliance with prescribed treatment as a factor in assessing her credibility," and not in finding her not disabled).

Here, the ALJ determined that Plaintiff did not suffer from a disabling impairment and was not disabled. (*See* doc. 13-1 at 34.) His noncompliance with prescribed treatment was one of many factors in her analysis of his mental limitations. (*See id.* at 31-33.) She noted that the record showed "improved functioning with compliance with treatment," and specifically cited his generally normal mental status examinations from Metrocare. (*Id.* at 31.) She also considered his conservative treatment history, as well as the limited outpatient records showing that he sought mental health treatment. (*Id.* at 31-32.) The ALJ therefore properly considered Plaintiff's noncompliance in evaluating whether his statements concerning the severity of his symptoms were consistent with the medical evidence and other evidence in the record. *See Fall*, 2012 WL 6026438, at \*10; *Johnson*, 2013 WL 632104, at \*21; *see, e.g., McNeil v. Colvin*, No. 4:12-CV-01628, 2013 WL 5785561, at \*11-12 (S.D. Tex. Aug. 22, 2013), *adopted by* 2013 WL 12106137 (S.D. Tex. Sept. 25, 2013) ("[T]he ALJ permissibly considered McNeil's occasions of non-compliance in evaluating the credibility of McNeil's own testimony about the severity of his symptoms.").

Citing *Clark v. Astrue*, No. CIV.A. 4:12-0350, 2013 WL 105017 (S.D. Tex. Jan. 8, 2013), Plaintiff argues that the requirements of SSR 82-59 apply because the ALJ's mental RFC assessment and ultimate denial of benefits "appear[] dependent upon the fact that [he] did not seek consistent

mental treatment, and when he did seek treatment, he was noncompliant[.]" (doc. 21 at 4.) In *Clark*, the court found the ALJ's failure to follow SSR 82-59 necessitated remand where the ALJ did not consider the claimant's noncompliance with treatment "merely in assessing the credibility of his subjective complaints," but instead relied on his noncompliance and "crafted an RFC that was dependent upon compliance with treatment." 2013 WL 105017, at *7. By contrast, the ALJ here did not presume Plaintiff's compliance with treatment when assessing his RFC and in finding him not disabled. While the ALJ referenced more recent evidence showing Plaintiff had not been compliant with treatment, including missed counseling appointments and not taking his medications, she noted that "even with non-compliance, he ha[d] denied increased stress or worsening of psychological problems or illicit drug use." (doc. 13-1 at 31-32.) Unlike in *Clark*, the ALJ's decision here did not state that the mental limitations assessed by the ALJ were dependent on medication compliance. *See Clark*, 2013 WL 105017, at *5-6.

Because the ALJ found Plaintiff was not disabled and did not rely solely on medical noncompliance for her decision, the requirements of SSR 82-59 did not apply. *See Fall*, 2012 WL 6026438, at *10; *Johnson*, 2013 WL 632104, at *21; *see, e.g., Hawkins v. Astrue*, 2011 WL 1107205 *3 (N.D. Tex. 2011) ("Because the ALJ considered plaintiff's failure to take prescribed medications only in assessing her credibility, and not in determining whether she would be able to work had she followed her medication regime, the judge was not required to follow the procedures set forth in 20 C.F.R. § 416.930 and SSR 82-59."). Accordingly, the ALJ did not have a duty to further develop the record by inquiring into the reason for Plaintiff's past failure to follow prescribed treatment. *See Clark*, 2013 WL 105017, at *7 (recognizing that "SSR 82-59 need not be followed when the ALJ considers the claimant's non-compliance only in connection with the claimant's credibility and with

18

the severity of the claimant's subjective symptoms"). Remand is therefore not required.

## IV.  CONCLUSION

The Commissioner's decision is **AFFIRMED**.

**SO ORDERED**, on this 27th day of October, 2020.

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE